**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 19, 2012

No. 11-20653

Lyle W. Cayce
Clerk

CHERYL LIKENS,

Plaintiff-Appellant,

versus

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS and SMITH, Circuit Judges.[*]
JERRY E. SMITH, Circuit Judge:

After coming home drunk, Wesley Vincent was found face-down in front
of his house by his wife, Cheryl Likens. He was taken to the hospital but eventu-
ally died. Likens tried to collect as the beneficiary of an accidental-death insur-

---

[*] Judge Dennis participated in oral argument but subsequently became recused from
this case, which is decided by a quorum. *See* 28 U.S.C. § 46(d).

No. 11-20653

ance policy, but the claim was denied under an alcohol exclusion, because Hartford Life and Accident Insurance Company ("Hartford") determined that the injury resulted from being legally intoxicated from alcohol. The district court granted summary judgment for Hartford based on the alcohol exclusion. We affirm.

I.

Vincent was driven home by a bartender at 11:30 p.m. after a night of heavy drinking. Likens saw him falling down, but instead of entering the house with her, he stayed outside to smoke a cigarette. Kayla Hudson came to the house later and found Vincent unconscious at the foot of the front-porch stairs. She alerted Likens, who came outside to check on Vincent. When Likens did not feel a pulse, she called for emergency help. EMS and deputies took statements from Likens and Vincent's granddaughter.

At the hospital, a differential diagnosis indicated Vincent had suffered a myocardial infarction (heart attack), cardiac arrest, respiratory arrest, and vertebrae abnormality. A CT scan found a fracture at the C2-3 vertebrae left facet joints but no sign of dislocation. After Vincent had been unconscious for several days with no brain activity, his family withdrew life support. His treating physician reported the cause of death as "anoxic brain injury secondary to cardiopulmonary arrest."

Likens later requested that the Houston Medical Examiner's Office investigate into the cause of death. Assistant Medical Examiner Mary Anzalone performed an external examination of Vincent's body and prepared a City of Houston Death Certificate. She determined that the immediate cause of death was "complications following blunt trauma with fracture of cervical spine"; she listed "chronic ethanolism" under the title "other significant conditions contributing to death but not resulting in underlying cause." She concluded that death was an

No. 11-20653

accident and the injury occurred because of a fall.

As the beneficiary of Vincent's policy, Likens made a claim with Hartford for death benefits. The policy covers losses, such as death or dismemberment, resulting from an "Injury," defined as

> bodily injury resulting directly from accident and independently of all other causes which occurs while the Covered Person is Covered on the Policy. Loss resulting from a) sickness or disease . . . or b) medical or surgical treatment of a sickness or disease, is not considered as resulting from injury.

The policy also excludes coverage for "any loss resulting from . . . [i]njury sustained as a result of being legally intoxicated from the use of alcohol."

Hartford denied the claim, citing the alcohol exemption. Likens administratively appealed, and Hartford upheld its determination in a letter indicating that Wesley's death did not meet the policy's definition of "Injury" and that Texas has a legal presumption of intoxication when the blood alcohol is at least 0.08.

## II.

Likens argues that the district court erred in interpreting the contractual term "legally intoxicated" as unambiguously not requiring a person to be engaging in an illegal act. Whether a contract is ambiguous is a question of law that we review *de novo*. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

Although Likens believes the term "legally intoxicated" is ambiguous, not only is the term's meaning plain, but even if it were ambiguous, her proposed definition is unreasonable. "Texas courts interpret insurance policies according to the rules of contract construction." *de Laurentis v. U.S. Auto. Ass'n*, 162 S.W.3d 714, 721 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Thus, we evaluate the contract based on its plain meaning, determining what the words

No. 11-20653

of the contract say the parties agreed to do. *Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*, 566 F.3d 452, 455 (5th Cir. 2009). If ambiguity in the contract, especially in exclusionary clauses, permits more than one meaning, the court should construe the policy strictly against the insurer. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. U.S. Liquids, Inc.*, 271 F. Supp. 2d 926, 932 (S.D. Tex. 2003). If the insured's construction of an ambiguous exclusionary provision is reasonable, the court must adopt it, even if it is not the most reasonable position. *Id.* at 931.

The parties cite opposing persuasive authority, demonstrating that some federal courts have found "legally intoxicated" to require a criminal act and others have not. In *MacDonald v. Unicare Life & Health Insurance Co.*, No. 3:07-0345, 2008 WL 169142 (S.D. W. Va. Jan. 17, 2008),[1] MacDonald was driven home after drinking and fell off his balcony. His insurance company refused to pay, relying on a similarly worded alcohol exclusion. Despite his blood alcohol level's being extremely high, the court found that the exclusion did not apply. *Id.* at *3. Examining numerous prohibitions based on intoxication limits—from driving a motor vehicle to public intoxication to getting a tattoo—the court determined there is no statutory intoxication limit set for standing on one's own property, so MacDonald could not have been "legally intoxicated." *Id.*

In *Balthis v. AIG Life Insurance Co.*, 5 F. App'x 320 (4th Cir. 2001), a man drank a lot, passed out on the couch, and choked to death on his vomit. The court interpreted "legally intoxicated" to mean that parties should look to the law of the state where the accident occurred. *Id.* at 322. The court examined the North Carolina statutory provisions dealing with intoxication while driving,

---

[1] As Hartford requests, we take judicial notice of the fact that the opinion in *MacDonald* has been withdrawn after the parties settled. However, since decisions of the Southern District of West Virginia are only persuasive authority in our court, the decision's no longer being in force is of little concern. We examine the decision to consider the persuasiveness of its reasoning, regardless of the strength of the precedent.

operating a motor boat, and operating an aircraft and found that the blood-alcohol content was above any of those standards. The court also used the alternative standard of having substantially impaired physical or mental functioning, finding that satisfied by the deceased's choking on his own vomit. *Id.* at 323. Because he met all those standards, the court found no need to determine which one applied.[2] *Id.*

The reasoning in *Balthis* is more persuasive. The plain meaning of "legal intoxication" is that one is intoxicated according to the definition specified in the law of that jurisdiction. Thus, in this insurance contract, "legally intoxicated" mandates we use the definition of "intoxication" applicable across multiple areas of Texas law.

Texas defines "intoxication" as

(A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body; or
(B) having an alcohol concentration of 0.08 or more.

TEX. PENAL CODE § 49.01(2). This definition applies to both civil and criminal law.[3] Although the state could set different levels for these divers categories, Texas has not done so.[4] Because this definition is broadly used in criminal and

---

[2] Likens's argument that *Balthis* is inapplicable is unavailing. The fact that Balthis choked on his own vomit, rather than dying from an accident, does not affect the court's reasoning regarding whether a person can be legally intoxicated while not engaging in a prohibited activity.

[3] *See* TEX. LABOR CODE § 401.013(a)(1) (defining "intoxication" in the Workers' Compensation Act as "having an alcohol concentration to qualify as intoxicated under Section 49.01(2), Penal Code"). The district court also noted that before the Texas Alcoholic Beverage Commission adopted new regulations in 2011, its regulations for serving alcohol defined intoxication the same way. Nothing suggests that the new laws, which require persons serving alcohol to be trained in intoxication law, did anything to disturb that definition.

[4] Although legal intoxication—as a defense to specific-intent crimes—would require a
(continued...)

No. 11-20653

civil contexts, this is the applicable definition of legal intoxication, regardless of the activity at issue. Further supporting that reading, this court has used the driving-while-intoxicated laws to determine that a sailor who jumped overboard was "legally drunk," though nothing suggests jumping off a ship was a prohibited act to perform while intoxicated.[5] No ambiguity exists in the insurance contract's intoxication exclusion.[6]

Even if the provision were ambiguous, interpreting "legally intoxicated" to require that the person be engaging in an illegal or prohibited activity is unreasonable. First, the policy includes an alternate version of the exclusion applicable in Minnesota, which specifically limits the exclusion to cases where injuries are sustained while operating a motor vehicle while intoxicated. This suggests that the policy intends the exclusion everywhere else to be broader, otherwise that Minnesota language would apply everywhere.

More importantly, requiring a prohibited activity does not comport with the ordinary understanding of legal intoxication, from common sense or statu-

---

[4] (...continued)
higher level of inebriation, that is an outlier; to utilize such an intoxication defense, a person must be far more impaired than what is considered "legally intoxicated" in other contexts. One of Likens's cited dictionaries recognizes how uncommon the intoxication defense is, specifying it is "available only rarely." NOLO'S PLAIN ENGLISH LAW DICTIONARY, www.nolo.com/dictionary (last visited May 18, 2012). Thus, it is not part of the plain meaning of the concept of "legally intoxicated."

[5] *See Reyes v. Vantage S.S. Co.*, 609 F.2d 140, 141-42 (5th Cir. 1980). Although it is not binding in this case, the regular use of drunk-driving levels as a measure of legal intoxication in admiralty contexts further suggests that the plain meaning of legal intoxication is the state-established intoxication limit, even beyond the activities the state prohibits intoxicated persons from performing.

[6] Hartford's additional argument—that the exclusionary provision is too different from the definition in the penal code, because the exclusion only allows alcohol—is similarly unavailing. The fact that the exclusionary provision focuses only on alcohol intoxication, but the Texas Penal Code includes a controlled substance, drug, or any other substance that has similar effects, does not make the definition completely inapplicable. The exclusion specifies "legally intoxicated from the use of alcohol," which shows that the policy recognizes that legal intoxication can result from the use of other substances.

tory design. When one discusses the concept of legal intoxication, the focus is on how much alcohol a person has had, not whether he has begun a prohibited activity. This common-sense interpretation comports with the structure of the Texas Penal Code: Intoxication is first defined generally, and the various activities that one is penalized for engaging in while intoxicated are described later. *See* TEX. PENAL CODE § 49.01 *et seq.* The law does not criminalize intoxication; it determines what levels of intoxication are too severe, then prohibits certain activities when a person reaches those levels.

Mr. Vincent was legally intoxicated under Texas law. The legal intoxication limit given in the Texas Penal Code is 0.08%. It can also be defined as not having normal use of physical and mental faculties. TEX. PENAL CODE § 49.01(2). Vincent had a blood alcohol content of 0.262%, over three times the legal limit. The National Institute of Health reports that people with similar levels will suffer from stupor and unconsciousness. No matter what reasonable definition of legal intoxication is used, Vincent meets it.

## III.

Likens's argument that Vincent's fall could have been caused by clumsiness does not create a genuine issue as to whether the alcohol exclusion applies. We review a summary judgment *de novo. Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012). Summary judgment is appropriate if, considering all the evidence, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

Though the language of the exclusion determines its scope, Texas cases generally interpret alcohol exclusions to apply even where alcohol is not the sole cause of death.[7] The exclusion says that the policy does not cover injuries "sus

---

[7] *Edwards v. Employees Retirement Sys.*, No. 03-03-00737-CV, 2004 WL 1898253, at *5
(continued...)

tained as a result of being legally intoxicated from the use of alcohol." That language is even softer than the "direct result" language that has be read to mean a proximate cause. Because the exact level is ambiguous, we can interpret the test to require proximate cause, thereby giving the beneficial reading to the insured.

There are two pieces of evidence that suggest alcohol was the main cause of Vincent's death: His extreme intoxication caused him to have difficulty standing, and the medical reports mentioned intoxication as contributing to his death. The death certificate and the accompanying medical report indicated that Vincent died from a fall and that ethanolism was a "significant condition contributing to death, but not resulting in the underlying cause." The best interpretation of that statement is that intoxication contributed significantly to the resulting death but was not itself the underlying cause of the death. In other words, the medical evidence Likens submitted says Vincent fell in significant part because he was drunk.[8]

Vincent also had an extremely high blood alcohol content and was visibly unstable on his feet. The EMS report explained that Likens said that when Vincent got home he was extremely intoxicated and kept falling. He could not even come into the house. His blood alcohol content was 0.262%, high enough that, according to the National Institute of Health, he would be in a stupor and have problems with depth perception, coordination, and balance.

With Vincent's significant physical impairment from intoxication and the

---

[7] (...continued)
(Tex. App.—Austin Aug. 26, 2004, no writ) (interpreting an exclusion where injury was the "direct result" of the insured's intoxication as requiring alcohol be the proximate rather than sole cause).

[8] The fact that "ethanolism" was not listed as the direct cause of death in no way contradicts intoxication's substantial role. If alcohol toxicity had killed Vincent, it would be a cause. Because it only caused him to fall and die that way, it is just a significant condition contributing to death.

death certificate stating that intoxication was a significant condition contributing to death, no reasonable jury could find that the alcohol exclusion did not apply. Although all justifiable inference must be drawn in favor of the non-movant, *Envtl. Conservation Org. v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008), the non-movant still cannot defeat summary judgment with speculation, improbable inferences, or unsubstantiated assertions. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). The medical opinion on the death certificate was that intoxication led to Vincent's fatal fall, and no medical evidence suggests otherwise.[9] His blood alcohol level means he was prone to falling—being in a stupor with a lack of coordination, motor skills, or balance—and the EMS report and the hospital report confirm that Vincent was visibly unstable (so much so that he could not even get into his house).

The only evidence suggesting another cause of Vincent's death is that he was clumsy. But even if he was already prone to falling down, such an exceptionally high level of intoxication makes falling far more likely. Combined with stupor and poor coordination, the alcohol's substantial role in making him fall cannot be ignored. Though it is not impossible that his clumsiness was actually the dominant factor in the fall and that it would have occurred even if he had not been so drunk that he could barely function, no evidence supports that theory.

The medical opinion in the death certificate stated the intoxication was a significant condition contributing to his death, and both his blood alcohol content and visual observation of his behavior suggest the alcohol caused him to fall repeatedly and suffer incredible difficulties with movement. Without something more to support the inference that his fall was mostly caused by clumsiness, a

---

[9] The only other medical evidence on cause of death is the hospital records that indicate Vincent died from a heart attack rather than the fall. That does not refute that alcohol made him fall, and relying on this medical evidence would require denial of coverage anyway, because heart attacks are not covered.

No. 11-20653

reasonable jury could not help but conclude that he fell and suffered injuries as a result of his intoxication.  On these facts, intoxication may not have been the only cause, but it does not have to be so to satisfy the exclusion.

The judgment is AFFIRMED.